HARKINS, et. al. *versus* COALTER, et. al.

A deed to a *feme covert*, and the heirs of her body, implying the creation of an *estate tail* in personal property, vests in her such absolute estate, as will be subject to the disposal of the husband, and liable for his debts.

Equity will give effect to the terms of a deed, conveying property to a *feme covert* for her exclusive use, even where no *trustee* is nominated, and will regard the husband a trustee, so far as to enforce a compliance with the intentions of the donor. But the *intention* to create a trust estate for the wife must distinctly appear.

Where a deed of personal property, conveying the same to the wife, stipulated that the property was given for the *joint use, behoof and support of the husband and wife, and subject to their joint possession ;* the Court held the deed not to create a separate and distinct estate for the wife, in exclusion of the husband's marital rights ; but subject to his debts.

This was a bill in Chancery, filed in the Circuit Court of Lauderdale, by Coalter and wife, to enforce the terms of a deed.

From the bill, answer, and exhibits, it appeared that Coalter having intermarried with Rachel, the

daughter of one James Rhodes, and become embarrassed, the said Rhodes executed his deed of certain personal property to his daughter Rachel, which, as was contended in the bill, was intended for the sole use, benefit and behoof of the wife of complainant, and to secure her a livelihood free from, and uncontrolled by the debts and contracts of her husband; that afterwards, certain of the creditors of the said Coalter, having obtained judgment against him, sued out execution thereon, under which certain slaves, part of the property conveyed in said deed, had been sold by the sheriff to Harkins, one of the defendants to the bill. The Chancellor below, on a final hearing, rendered a decree in favor of the complainants, for two of the slaves, (one having died pending suit) and for their hire.

The question presented for the decision of the Court, on error, and on which was based the decree below, was the construction of the deed, and whether the estate thereby conveyed, vested such property in the wife as could not be subjected to the husband's debts. The deed, as appeared from the record, was in the following words:

" Know all men by these Presents, that in consi-
" deration of the natural love and affection I bear to
" my daughter Rachel Rhodes, since given in mar-
" riage to, and now the wife of James Coalter, I give
" to said Rachel, otherwise Coalter, and to the heirs of
" her body by the said James Coalter begotten, if
" if they should have any; if they should have no
" children during the lives of her the said Rachel and
" James, then to have and to hold said property, to-
" wit, one negro woman named Eady, supposed to
" be about twenty years of age, also a negro boy, her
" child, named Harris, aged about seventeen months;

" one bed, bedstead and furniture, twelve bed spreads
" and sheets, also five head of cattle, four head of
" sheep, one bureau, one table and candle-stand, one
" large spinning wheel, and one flax wheel, and the
" increase thereof, to the only proper use and behoof
" of the said Rachel and James, during their lives,
" and to remain in their joint use and possession for
" the use and support of the said Rachel and James,
" and none others, and for the use and support of such
" such child or children as they may have by virtue
" of and during their marriage. In testimony where-
" of, I have hereunto set my hand and seal, this 16th
" day of August, 1827."

" JAMES RHODES, (Seal.)"

" Signed, sealed, in the presence of us."

his<br>" NEHEMIAH ⋈ SHARP,"<br>mark.

his<br>" JOSHUA ⋈ RHODES."<br>mark.

P. ANDERSON, for Plaintiff in error.—The inten-
tion here, seems to have been to create an estate tail.
The operative words for that purpose are used. Es-
tates tail are abolished by our law ; and this convey-
ance, by our statute, as well as by the Common Law,
as to personal property, conveys a fee-simple title, or
the highest estate that can be given. The title to
the property was, therefore, complete in the husband.
4 *Cruise*, 236, *marg.—Fonb. Eq.* 338—*Aikin's Di-
gest*, 95.

There could be no doubt on this subject, unless
produced by the subsequent part of the deed. There
is a subsequent provision, in the *habendum* to the

deed, that if there be no children, then there is to be a life estate to husband and wife; and then to add to the absurdity, this estate upon condition of *no children*, is attempted to be limited *to the children*. The estate attempted to be created in the *habendum* of the deed, is repugnant to that in the premises, and is therefore void. 4 *Cruise* 226, *marg.* 1——*Searg. & Rawl.* 374. This estate for life, is void for another reason : it was on condition of there being no children, and there were children. On this void estate for life, there could of course be no valid limitation. The words of the premises must therefore have their full effect. And yet there can be no ground on which to set up a use in behalf of the wife, but as a limitation to this void estate.

Courts will not easily admit a construction, that destroys the estate of the husband. He is a purchaser, who assumes high responsibility : it is only when it clearly appears, that what is given was given for the *separate use of the wife*, and that otherwise it would not have been given, that such construction will be admitted. 5 *Vesey* 518——3 *Vesey* 166. There are no words in this deed, construe it as you will, that creates a separate estate.

The husband had an interest in this property : by the words of the deed, it is for his benefit, as well as for the wife. He is in no way excluded. We are entitled to his interest. He ought to have been made a party. 1 *Johns. C. R.* 90. This omission of itself would be sufficient to reverse the case.

In regard to the husbands rights, see also *Chauncy's Rights of married women* 267, 269.

The parol testimony offered, ought to have been excluded. It went to explain the deed, and to attempt to throw light on certain dark parts of it. This was

inadmissible.   1 *Johns. C. R.* 231, 240—6 *Vesey* 396
—*Fonb. Eq.* 312—2 *Vesey, sr.* 194—2 *Dess.* 115.

This deed, however, I contend was wholly inopera-
tive.   The property did not come to Coalter by the
deed.   The marriage took place in August.   The
deed was executed in September, and the negroes
were delivered on the 28th of the ensuing February.
No delivery accompanied the deed, it was therefore
void.   A promise to convey is not a conveyance.
The slaves passed by the delivery, and not by the
deed.   2 *Kent Com.* 354—18 *John.* 145—2 *Johns.* 52.

ORMOND, *contra.*—The delivery of the slaves,
though subsequent to the date of the deed, was, I
contend, sufficient.   If the creditors of Rhodes had
interposed between the date of the deed, and the de-
livery of the property, it might have been a different
case.   But in a case like this, the Court will infer
that the delivery was in pursuance of the deed.   If the
*locus pœnitentiæ* did exist, (as the counsel insists,) it
was not exercised.

The bill says, that a man in whom confidence was
placed, was called on to write the deed.   *Confidence*
was never more *misplaced.*   The deed is badly drawn.
The *intention,* however, is the grand criterion in the
construction of deeds.   And where there is a *general*
and a *particular* intent, Courts will sacrifice the lat-
ter, to effectuate the former.   Language is the instru-
ment of thought, imperfect with all persons, but most
imperfect with the ignorant: and where Courts sit
upon the construction of a contract, the object of in-
quiry is, not what was the particular language, if it
be doubtful, but what did the parties intend to do by
the contract.   *Now Coalter was insolvent, as the bill
shows : these debts were pressing him at the time of the*

*making of this deed.* Was this property intended by the father of the wife to go to these creditors of the husband? The answer must be in the negative; and this circumstance goes far to show, that this property was intended for the daughter. There was nothing immoral in the intention, nor in the transaction. The creditors of Coalter were not injured. The gift from Rhodes did not make their situation worse, and he was under no obligation to make it better.

Why was the deed made at all? This question is sufficient to settle the general intent of the grantor ; it cannot be answered, but on the supposition of an intent to secure the property from the husband in his embarrassed circumstances. 4 *Cruise's Dig.* 205.

Particular words and phrases repugnant to the general intent, will be rejected.—3 *Atkins* 136—-2 *Comp.* 600.

The question then arises, can a man make a provision for his daughter, where the husband is insolvent? Must she grovel in the dirt, despite the wish and ability of the parent. Our laws are not thus inhuman, 4 *Dess.* 447. See *Chauncy's Rights of married women* page 262, where it is laid down that a separate property may be granted to a wife for her support, and that of her children, without the creation of trustees. It will be sufficient if the property be given "to her sole and separate use" or "for the livelihood of the wife." The language of this deed, I conceive, goes as far as that; and there are other circumstances which establish the intent of the grantor.

The deed is so inartificially drawn, that it will not admit of that species of legal criticism to which the counsel wish to subject it. They speak of the *premises*, the *habendum* and the *tenendum.* Why, these

terms have no meaning when applied to such a deed as this. What the counsel calls the premises is mere recital, and no grant at all.

It is said, that the words "*heirs of her body*" convey an estate tail. It is true, they had in general that effect at Common Law; but there is no such estate here; and it is clear that the words were used by an ignorant man, who had no knowledge of their import. The words ought therefore (as they have frequently been) to be made to give way to the intent.

By Mr. Chief Justice SAFFOLD:

According to the view we take of the case, the following enquiries embrace the entire merits, and are decisive of the controversy.

1. What is the true and proper construction of the deed.

2. The consequence of the non-delivery of the property at the time the deed was delivered, and the subsequent delivery, under the circumstances of the case.

3. The legal effect of the conveyance in exempting the property from liability to Coalter's debts.

The deed is doubtless one of the most obscure and incongruous instruments, that could have passed from the hands of the merest tyro, in the scrivener's art. It is scarcely possible to analize it, and if done, the parts are incompatible. But if the intention of the grant, can be satisfactorily ascertained, from the language employed, however vaguely, or inartificially expressed; it is the duty of the Court to construe and enforce it accordingly, if it be not in violation of any rule of law.

It is unnecessary to investigate minutely, the technical rules relative to the office of the *premises*, the

*habendum*, &c. noticed in argument; for these distinctions do not appear to have entered into the imagination of the grantor. Could we satisfactorily explore and extract the *intention*, this formality might be disregarded. The language of the deed is as follows :

" Know all men by these presents, that in consideration of the natural love and affection I bear to my daughter Rachel Rhodes, since given in marriage to, and now the wife of James Coalter, I give to the said *Rachel, otherwise Coalter, and to the heirs of her body* by the said James Coalter begotten, *if they should have any* ; if they should have *no children* during the lives of the said Rachel and James, *then to have and to hold the said property*, to-wit, (here the negro woman and child, &c. are mentioned and described) *to the only proper use and behoof of the said Rachel and James during their lives, and to remain in their joint use and possession; for the use and support of the said Rachel and James, and none others, and for the use and support of such child and children* as they may have by virtue of, and during their marriage." In testimony, &c.

Were I to attempt to extract the intention of the deed, from its language, by adding a few words which appear to have been omitted, expunging repetition, and by a slight transposition, I would read it thus : In consideration of the natural love, &c. to my daughter Rachel Rhodes, I give to her and to the heirs of her body, if any, by her present husband J. Coalter, a certain negro woman and child, &c. to have and to hold said property to the only proper use and behoof of the said Rachel and James, and any such issue, and for their joint use and support, during the lives of said Rachel and James. But *if they*

should have no such child or children, then said property to remain in the joint use and possession of the said Rachel and James, for the support of themselves, and none others.

Regarding this as a fair and just interpretation of the deed, the intention must have been, (in the event of a child or children, by the marriage, which has happened) to create an *estate tail* for the permanent benefit of the issue, unless it be otherwise explained and controlled by the latter provisions of the deed. It is contended, however, that such is the case ; that the *habendum* limits and qualifies the *premisss*, so as to point out the wife, during her life at least, as the exclusive object of her father's bounty ; and that the attendant circumstances, such as the known insolvency of the husband at the time, and the execution of a deed, instead of a mere delivery of the property, do (as was supposed by the *Chancellor* below,) greatly strengthen this conclusion.

But this argument is in opposition to the well founded objection, that such is not the office of the *habendum*, and in this case, can not be its effect; also, that J. Coalter, the husband, from the language of the deed, was no less the object of the grantor's bounty, than his wife; and that extrinsic circumstances can never be allowed to *contradict the expressions of the deed.* In construing the *habendum*, or latter directions of the deed, we should surely be doing violence to the expressions, to deny to the husband an interest in the property, equal to that of his wife. The least equivocal language used, is that which directs it " to the only proper use and behoof of the said Rachel and James during their lives, and to remain in their joint use and possession, for the joint use and support of said Rachel and James, and none others."

It is true that this is so declared on the contingency of no children, but if it be resorted to in aid of, or to explain the preceding direction, it can have no other effect than to evince the donor's intention to place the husband and wife on a perfect equality. This I take to be the only legal and reasonable construction.

2. Respecting the time and manner of delivering the property, but little need be said. Admitting, as I am prepared to do, that to constitute a valid donation *inter vivos*, an actual delivery of the property, or some tantamount act, even where a deed has been executed, is necessary to bind the donor, and afford validity to the gift:[a] yet, under the circumstances of this case, the objection of non-delivery does not appear sustainable. The fact, that the donor did not claim, or exercise the *locus pœnitentiæ*; on the contrary, that the property was delivered on the expiration of the hire of the one slave only, that could have been of any use; and this, without any objection to the terms of the deed, by the donees—these are circumstances implying a consumation of the gift, according to the terms of the deed. It may also be remarked, that as the rights of the donors, creditors are not involved, and there is no objection to the conveyance for the want of registration, the necessity for a delivery of the property simultaneously with the deed, was not the same that it would otherwise have been. I therefore conclude, that this objection alone could not prevail against any limitation or restriction of the title or interest in the property, which may have been sufficiently prescribed by the terms of the deed.

3. The remaining branch of the case, relating to the legal effect of the conveyance as drawn, involves a highly interesting enquiry, and has been argued on

[a] 2 Kent's C. 354—2 Johns. R. 53—18 id. 145.

both sides, with zeal and ability commensurate to its importance. It is, however, necessarily conceded by the counsel, that so far as the deed discloses an intention to create, in the wife, and the heirs of her body, an estate in *fee tail*, the intention was in violation of the rules of law, and can not be sustained; that, even by the Common Law, such restrictions, or limitations were void in reference to *personal* property, such as this; and that by a statute, passed as early as 1812,[a] it [a] Aik. Dig. 95. was declared, that every estate in *lands or slaves*, which had been or might be created an estate in *fee tail*, should be an estate in *fee simple*, and be discharged of the conditions annexed by the Common Law, restraining alienation before the *donee* should have issue; so that the *donee* or person in whom the conditional fee vested, should have the same power over the estates, as if they were pure and absolute fees—with a *proviso* relating to lands only. Therefore, without farther enquiry on this point, the proposition may be adopted, that so far as the deed expresses an intention to create an *estate tail in Rachel Coalter, and the heirs of her body*, the legal effect was to vest in her an unqualified and absolute estate; and, she being a *feme covert*, the law, of course, immediately vested the same in her husband, subject to his disposal, and to all liability for his debts. The fact that the deed was executed in Tennessee, connected with the principle of law respecting the *lex loci contractu*, is not understood to be relied on in support of the entailment; for without enquiring into the law of that State, the circumstance of the donation not having been consumated there, or otherwise than by the subsequent *delivery* of the property, which took place in this State, is sufficient to subject it to our law. Whether the mere introduction of it into this State after a per-

fect gift would produce the same effect, I need not now decide.

Then, unless the attendant circumstances, or the latter clauses of the deed, be sufficient to vary and control the preceding, and to constitute *a separate property in the wife alone*, or *in the wife and child;* there is nothing to exclude the husband's *marital* rights, and the slaves must stand subject to his disposal, and of course subject to his debts.

That any owner of property is competent, so to convey it, as to create a *separate* estate in a *feme covert*, for her exclusive use, is a well settled principle. And " when that intention is once ascertained to be, that the use is for the wife alone,' and not for her husband, equity will give effect to it, without any regard to the legal maxim, that the husband is the head of the wife, and, therefore, all that she has belongs to him."[a]  It is also at the present day unimportant, whether, in a devise of real or personal property, to the separate use of a married woman, the limitation be to herself only, or to trustees for her; " as it is now settled, that if the limitation be to her only, for her own separate use, without the nomination of a trustee, although the Common Law vests her personal property in the husband, and the rents of her real property, in him, during her life, still equity will consider him as a trustee for his wife, and enforce a compliance with the intention of the donor."[b] The trust estate must be very distinctly expressed, before the Court will establish it against the rights of the husband. "It seems, however, to be immaterial in what form of phrase a trust of that nature is described; technical language is not necessary, as all that is required is, that the intention of the gift should appear manifestly to be for the *wife's separate enjoy-*

[a] Clancy's Rights of married women, 251. bk. 3 ch. 1

[b] Id. 257.

*ment."* But it is farther declared, that "Such a claim on the part of a married woman, being against common right, the instrument under which it is made, must clearly speak the donor's intention to bar the husband, else it can not be allowed." Also, " that the strongest evidence of intended generosity, and of bounty towards the wife, will not be sufficient to give her a separate estate, unless, in addition, language be used by the donor clearly expressing the exclusion of the husband; or else directions be given with respect to the enjoyment of the gift, wholly incompatible with any dominion of the husband."[a] I consider [a]Clancy, book 2, 262. this brief exposition of the principle, quite sufficient to shew, that neither the fact of the husband's insolvency at the time; of the gift having proceeded from the wife's father; nor the resort to a written conveyance, or all of them together, nor any other attendant circumstances, can have the effect to constitute an estate which is palpably irreconcileable with the express directions of the deed.

In this case it has been shewn, that the premises, or early clause of the deed, imported an estate *tail,* which in law, or equity can have no other effect than to create an absolute estate in the husband; also that the latter provisions constitute the husband no less an object of the donor's bounty or generosity, than the wife. The property is declared to be for their *joint use and behoof, and support,* and subject to their *joint possession.* Was any case cited in argument, where, by construction, so much violence was done to the language of the deed, as to maintain, that a clause expressly creating an estate for the *joint use and support of two,* was intended to create a *separate property for the sole use of one?*

The case which appeared to extend the principle

*3 Atk. 399. farther than any other, was that of *Darby* vs. *Darby*.[a] There it was held by Lord *Hardwick*, that if an estate be given to a husband for the " livelihood" of his wife, this ought to be considered a trust for the use of the wife; for that the word *livelihood*, showed an intention in the giver that it should be to her sole and

b Clancy, 263, separate use.[b] The authority of that case has since 264.
cId. 263, noted been denied.[c] But admitting its authority, the claim of the wife was there better founded than here; *that* gift was expressed to be for the *livelihood* of the wife, no other use being expressed; this is equally expressed to be for the *joint use and support* (tantamount to livelihood) of the *husband and wife.* The case of *Kirk* vs. *Paulin*,[d] where a bequest to a married wo-

*7 Vin. Ab. 95. man, of property " to be at her disposal," was held to give her a separate estate, can not be viewed as a parallel with this. The *separate* control, use and benefit of the wife, was there clearly indicated; *here it was expressly negatived.* The same may be said of the case of *Woodman* vs. *Horsley*, and *Lee* vs. *Prie-*

*3 Br. C. C. 383 *aux*,[e] where it was held, in one case, that the words, and 381. " the wife's receipt shall be a sufficient discharge, notwithstanding her coverture;" and in the other, the same without the addition of the words "notwithstanding her coverture," were held to be equivalent

f Clancy, 266, to saying, " to her sole and separate use."[f] ch. 2. But other cases, differing very slightly from the foregoing, shew, that very nice distinctions are to be observed in determining the character and effect of such

g 3 Br. C. C. 383 gifts. In *Johnes* vs. *Lockart*, cited in *Lee* vs. *Prieaux*,[g] it seems to have been held, that a legacy to a *feme covert*, " to her own use and benefit," was not to her *separate use.* Also it has been held, where the direction in a will was, that a sum of money should be paid to an unmarried woman, on her arriving at the

age of 21 years, or her day of marriage, " to and for her use," during her life, without the words, " sole and separate,".that there, her husband was entitled to it. . *Jacob and Wife* vs. *Amyatt*.[a] Also in the case cited of *Kirk* vs. *Paulin*, where it was held, that the direction that the property should *be at the wife's disposal*, gave her a *separate* property; it was at the same time ruled, that a bequest, "for her use and benefit, did not create in her a separate estate. . A construction similar to the latter has been put on the words "for her *own* use and benefit," where the testator has used with respect to other parts of the property given at the same time, the *technical* language, fit to confer a *separate* estate. ( *Willis* vs. *Sayers*.)[b] No doubt, however, in the case last referred to, the separate interest would have been sustained, but for the circumstance of the donor having, in the same instrument, bequeathed a different interest to the same person "for her sole and separate use," and thereby discovered his knowledge of the technical form of excluding the right of the husband—indeed the Vice Chancellor, so expressed himself.

In the case of *Roberts* vs. *Spicer*,[c] the testator had bequeathed money and rent to trustees, and directed them to stand possessed thereof, for the benefit of a married woman, and her children; and that the same should not be subject to the debts, engagements, or be in any manner under the control of her husband; and also bequeathed to the same woman £200, " to and for her own use and benefit;" it was decided, that these *latter* words did not convey a *separate* estate.[d] I understand the principle of this latter decision to be, that the language employed in bequeathing the £200, did not clearly indicate an intention to create a separate property in the wife, excluding the mari-

[a] Mad. 376 in the notes.

[b] 4 Mad. 409— Clancy. 268.

[c] 5 Mad. 491.

[d] Clancy 268.

tal rights of the husband, as was done by the same will in relation to the other money and rent therein bequeathed; that the words "to and for her own use and benefit," were not necessarily of a different import from the words, *to her own proper use and behoof*, which is a common form of expression in conveyances where no limitation or restriction of the use, but an absolute estate is intended. Another case which appears to have carried the rights of the wife to their utmost boundary, is that of *Dixon* vs. *Olmins*.[a] There the testator had bequeathed to Lady *Waltham*, two bonds of her husband, Lord *Waltham*, and also a mortgage of Lady Waltham's estate, and all interest due thereon; and had directed, that the bonds and mortgage, "be delivered up to my said niece, Lady Waltham, whenever she shall demand or require the same." The question was, after Lord Waltham's death, whether the bonds and mortgage were to be considered as given to Lady Waltham for her separate use, and as outstanding debts against the assets of her deceased husband. It was objected in behalf of his creditors that no such intention had been sufficiently expressed; that the control of the husband over the subject had not been excluded. But Lord *Loughborough* ruled, that as these securities were to be given to the *wife on her demand,* her husband could not have obtained them from the executors, without a demand made by her, which gave her a dominion over them; and they must therefore be considered as given to her *separate use*.[b]

In this latter case, I think another reason might also have been urged in support of the decision. The intention was manifest to make the same disposition of the bonds and the mortgage; an ordinary gift of the bonds to the wife, or any bequest which would

a 2 Cox's R. 414

b Clancy, 265.

have subjected them to the marital rights of the husband, must have operated as an extinguishment of them, no less than to have remitted the debts in any other way. Had this been the testator's intention, his course would have been plain and obvious. But the circumstance of his having bequeathed them to the *wife*, who was *his niece*, and of his having directed his executors to deliver them to *her*, whenever *she* should demand or require them, clearly evinced an intention not to extinguish the debts, but to retain them for the benefit of the wife, free from the control or dominion of the husband.

In cases where estates have been created for the *joint* benefit, joint livelihood, or "joint use and support," of husband and wife, or husband, wife and children, no authority has been cited, and it is presumed none can be found, for a *partition* of the property to the prejudice of the husband's creditors, or of subsequent *bona fide* purchasers under him. *Clancy,* (269) after a very learned investigation of the whole subject, and a review of the cases I have referred to, and several others, says, "All these cases clearly prove, that there must be a *manifest intention evinced by the language of the donor*, that the wife shall have the *exclusive property* in the gift, without which, Courts of equity will not suffer the legal rights of the husband to be superseded." And that if other circumstances exist, strongly warranting the inference that the testator intended the bequest for the *sole* benefit of the wife, such as her separation from her husband, and very limited means of support, and these known to the testator; yet if such intention be not expressed in the bequest, even Chancery must disregard them, and leave the estate to the operation of the law.— (Vide also *Palmer* vs. *Trevor.*)[a] ⸰1 Vern. 261.

This I consider a sufficient illustration of the doctrine, to shew clearly, that this gift can not inure to the seperate use of the wife and child, or either ; that the marital rights of the husband have not been excluded.

This being the opinion of the Court, an examination of any other points, made in argument, is rendered unnecessary.

Let the decree of the Circuit Court be *reversed*, and the bill be dismissed ; and charge the complainants with the costs of this Court, and of the Court below.