JOHN P. SANDERSON, APPELLANT, VS. ELIZABETH S. L. JONES, TRUSTEE, &C., MARY M. E. HARRISON ET AL, APPELLEES.

1. Where a marriage settlement is made by husband and wife *in trust to the use and behoof of husband and wife during their natural lives*, it is by no means clear that a separate estate is created for the wife.

2. The husband is entitled during his life to the income of property settled upon himself and wife jointly, as a compensation for his liability to maintain her; he is entitled to the whole of the profits of the trust estate when supporting the expenses of the household.

3. The right of alienation is incident to the ownership of property, and a restriction supposes incapacity, and is inapplicable to the case of a man.

4. Trusts are alienable, and a husband may sell and dispose of his life interest in such property.

5. A sale of personal property by a husband, under a marriage settlement as aforesaid, held good as to a daughter to the extent of the interest of the father, especially where there is no allegation that the husband has not property to maintain the wife, and does not maintain her.

6. The decree of the Court in favor of the husband of the daughter against the father and grantor in the settlement, settled as aforesaid, conclusive as to his life interest, right of possession and power of alienation.

7. If the remainder-men, the children provided for after the termination of the life estate, have a fear that the property is in danger of being diverted and squandered, and they have such interest against the purchaser f.om the father, their remedy is by bill *quia timet.*

Appeal from a decree of the Circuit Court for Duval county.

The bill in this case was filed by Elizabeth S. L. Jones, as Trustee, &c., under the marriage settlement hereinafter set forth, and Mary M. E. Harrison, wife of Robert Harrison, Senior, by her next friend, Charles P. Cooper, who

claims as *cestui que trust* under said settlement, and Robert Harrison, Junior, and others, children of said Robert Harrison and Mary M. E. Harrison, who claim as remaindermen under said settlement, complainants against Robert Harrison, Sr., and John P. Sanderson.

In the year 1813, in anticipation of a marriage between said Robert Harrison, Senior, and said Mary M. E. Harrison, then Mary M. E. Cooper, a deed of marriage settlement was executed by said Harrison and said Mary and the trustees therein named, of which the following is a copy :

Georgia :—

This indenture, tripartite, made the ninth day of June, in the year of our Lord one thousand eight hundred and thirteen, and of American independence the thirty-eighth, between Robert Harrison, Esq., of the first, Mary Magdalene Cooper, (spinister) of the county of McIntosh, the daughter of Col. John Cooper, of said County and State, of the second part, and Samuel Harrison, Jr., James Nephew, of the county of McIntosh, and William Anderson and Joseph Jones, of the county of Liberty, Esquires, of the third part.    Whereas, by God's permission, a marriage is intended to be had and solemnized by and between the said Robert Harrison and Mary Magdalene Cooper.    Now, this indenture witnesseth that in consideration of the said intended marriage and for securing and providing a maintenance and support for the said Mary Magdalene Cooper in case of casualties ; also, in consideration of the' sum of one dollar to him, the said Robert Harrison, in hand, well and truly paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged,

Hath, and by these presents doth bargain, sell, convey, assign, transfer and set over unto the said Samuel Harrison, James Nephew, William Anderson and Joseph Jones, and the survivor of them and to the heirs, executors and administrators of such survivor, all those certain sixteen Negro Slaves named as follows: Esau, Lydia and her child Mary, Tom, Alexander, Abraham, Drummond, Jacob, Boatswain, Stephen and Prince, Patty and her two children James and Sarah, Henry and Flood, with the issue and increase of the females.

To have and to hold all and every the said Negro Slaves as named, with the issue and increase of the females unto them, the said Samuel Harrison, James Nephew, William Anderson and Joseph Jones, and the survivors of them, their heirs, executors or administrators: Whereas to and for the uses, intents and purposes hereinafter mentioned, expressed and declared of, for or touching or concerning the same or any part thereof, and to and for no other use, intent or purpose whatsoever; that is to say, whereas, for the use and benefit and behoof of the said Robert Harrison, his heirs and assigns until the said intended marriage shall take effect and be solemnized, and from and immediately after the solemnization of the said intended marriage, to the use and behoof of the said Robert Harrison and Mary Magdalene Cooper, his intended wife for and during their natural lives, without any manner of waste or impeachment of waste to be had, done, made or committed, and after the determination of that estate, to the said Samuel Harrison, James Nephew, William Anderson and Joseph Jones, and the survivors and survivor of them in trust to and for the following uses, that is to say, to and for the

use and benefit and behoof of the child or children of them, the said Robert Harrison and Mary Magdalene Cooper, his intended wife, share and share alike to them, their heirs and assigns, for ever ; and after the determination of that estate, to the said Samuel Harrison, James Nephew, William Anderson and Joseph Jones, and the survivors and the survivor of them in trust, that is to say, should there be no issue living by and between the said Robert Harrison and the said Mary Magdalene Cooper, his intended wife, at the decease of either of them, said Robert Harrison or the said Mary Magdalene Cooper, his intended wife, that then and in such case the said estate so made over, transferred, and assigned in trust as aforesaid, shall go to the longest liver, and be to the sole use and be the right and property of the survivor, to his or her use, benefit and behoof forever, anything to the contrary notwithstanding; and whereas, the said Mary Magdalene Cooper is and will be well and sufficiently entitled of, in and to a certain estate to be hereinafter ascertained; now by these presents it is agreed upon and fully understood and hereby covenanted by and between the parties to these presents, that when such estate can and may be ascertained, that a schedule of the same shall be hereinafter annexed, attested by two or more credible witnesses, which said estate, real or personal, shall be subject to all and every the covenants, conditions, premises, trusts and limitations, as hereinbefore expressed and contained, or that may hereafter be further expressed, covenanted, limited and declared, and that the said schedule so to be annexed shall be taken and considered as part and parcel of this Deed of Settlement, anything to the contrary notwithstanding ; and by these presents

55

it is agreed upon, fully understood and covenanted by and between the said parties to these presents, that the said bargained, sold, conveyed, assigned and set over estate or estates, with every the rights thereto appertaining or belonging, both as real or personal or otherwise in manner and form as aforesaid, that the same, nor shall any part or parcel thereof, at any time or times hereafter, be subject or liable to the payment of any debt, judgment, execution or account, or demand otherwise, now due or owing by the said Robert Harrison for, or by reason of any matter or thing whatsoever, or that may hereafter become due owing or be contracted, anything to the contrary notwithstanding ; and it is hereby provided, covenanted and agreed by and between all the parties to these presents, that it shall and may be lawful to and for the said Robert Harrison and Mary Magdalene Cooper, his intended wife, with the approbation and assent of the said trustees or the survivors or survivor of them, at any time or times hereafter, by any writing. or writings under their respective hands, and attested by two or more credible witnesses to revoke and make void, alter or change all and every of, or any of the uses, trusts or estates hereinbefore limited and declared of and concerning or touching the premises or any part or parcel thereof, anything herein contained to the contrary notwithstanding ; and lastly, the said parties and each and every of them do hereby covenant, grant and agree to and with each other that the present Deed of Settlement, and every article, matter and thing therein contained, shall be carried into effect according to the true intent and meaning of the same, and according to the most natural and obvious construction of the words, and agree-

able to what shall appear to have been the sense and meaning of the parties at the time of executing the same, anything to the contrary notwithstanding.

"In witness whereof the said parties to these presents have hereunto set their hands and seals, the day and year first above written, 1813."

ROBERT HARRISON, [seal.]
MARY M. COOPER, [seal.]
JAMES NEPHEW, [seal.]
WM. ANDERSON, [seal.]
JOSEPH JONES, [seal.]

"Signed, sealed and delivered in presence of
JOHN GIGNITLANT,
JAMES PELOT.
Recorded 2d July, 1822.

JOHN P. BALLARD, Clerk."

The marriage anticipated, was shortly after solemnized and the parties subsequently removed to Florida whilst the latter was a provence of Spain. On the fourth day of January 1844 the said Robert Harrison senior executed a deed of trust for the benefit of Mary E. Sanderson, a daughter of the said Robert Harrison senior and Mary M. E. Harrison his wife, who had intermarried with John P. Sanderson, of which the following is a copy.

"This Indenture made and entered into this fourth day of January in the year of our Lord one thousand eight hundred and forty four, by and between Robert Harrison of Nassau County and Territory of Florida of the first part, and Harrison Starrett of the County and Territory aforesaid of the second part, Witnesseth that whereas the said party of the first part in order to guard his daughter Mary.

E. Sanderson as much as may be against the casualties
and misfortunes of life, and provide for her a suitable and
separate maintainance and support, and which will not be
subject to the fate of her husband's misfortunes or enter-
prises in business, hath proposed for that purpose to convey
the property hereinafter described, to a trustee to and for
the separate use of his daughter Mary E. Sanderson, and
the said Harrison Starret party of the second part having
consented to act as trustee, and the said Mary E. Sanderson
having also consented to the same: Now Therefore to
carry into effect the said intention and to make the said
conveyance Effectual in Law."

"This Indenture witnesseth that the said party of the first
part in consideration of the sum of ten dollars good and
lawful money to him in hand paid by the said party of the
second part, at and before the sealing, and delivery of
these presents, the receipt whereof is hereby acknowledged
hath granted, given, bargained, sold, delivered and con-
firmed unto the said party of the second part, his executors,
administrators or assigns, all his right title and interest of,
to or in the Negro Slaves following to wit :

1. Mitchell, male, aged 35,   4 Edgar male. aged 2
2. Daniel   "      "     21,  5 Rodger    "     "  5
3. Richard  "      "     20,  6 Will      "     "  9
7. Sarah female,   "     31.
8. Nancy    "   .  "     18.
9. Betsey   "      "     17.
10. Fanny   "      "      2.
11. Harriet "      "     35.

"To have and to hold the said Negro Slaves all and sin-
gular, together with the future increase thereof hereby,

given, granted, bargained, sold, delivered and confirmed unto the said Harrison Starrett, party of the second part, his executors administrators and assigns, by as full and ample title as the same is owned by the said party of the first part, subject nevertheless to the said trusts, limitations, provisions and restrictions hereinafter contained, that is to say.  In trust nevertheless, and these presents are upon the express condition that the above described property is to be owned and held by the said party of the second part, to and for the only proper use, benefit and behoof of the said Mary E. Sanderson daughter of the said party of the first part, and the heirs of her body.  And the said Harrison Starrett shall have and hold the said above described property, for the uses and trusts aforesaid, and for none other whatsoever, and upon the further condition that the said Negro Slaves above given, granted, bargained, sold and conveyed, shall be and remain in the possession of the said Mary E. Sanderson, and her heirs aforesaid, free and secure from all debts and claims whatsoever, now subsisting, or which may hereafter subsist against the said party of the first part.  And the said party of the second part, by these presents for himself his executors, administrators, and assigns acknowledges and accepts, ratifies and confirms the aforesaid uses and trusts subject to all the condtions, provisions, limitations, and restrictions hereinafter expressed, and it is further expressly conditioned and agreed by the parties hereunto, that the said Harrison Starrett his executors, administrators and assigns shall and will at any time or times hereafter sell and convey the same, and at the proper expenses of the said Mary E. Sanderson, or her said heirs, make execute and deliver title or

titles to the said property mentioned, or any part or parcel of the same, whereon and in the manner and form, and to such person or persons as the said Harrison Starrett Trustee or his executors, administrators or assigns shall be requested or directed to do, by writing under the hands and seals of the said party of the first part and Mary E. Sanderson his daughter or her aforesaid heirs, and the said Harrison Starrett trustee, his executors, administrators, or assigns, shall upon request in manner and form aforesaid, again reinvest the money arising from the sale of any of the property aforesaid, subject nevertheless in every respect to all the provisions, uses, trusts, and conditions as those by him sold and conveyed, and the said Robert Harrison, party of the first part for himself, his heirs, executors, administratros or assigns, will warrant and defend forever the said given granted, sold and conveyed negro Slaves with the future increase thereof unto the said Harrison Starrett trustee, his executors, administrators, or assigns for the uses and purposes aforesaid against all persons whatsoever.

" Signed sealed and delivered the day and year first above written."

In presence of   ROBERT HARRISON,   [seal.]
E. HARRISON.   HARRISON STARRETT. [seal.]
ROBT. M. PEASE,
ROBT. HARRISON.

Subsequently to the execution of this deed of 1844, Mary E. Sanderson, the *çestui que trust*, therein died without leaving any children, and John P. Sanderson, her husband, became administrator of her estate. As such administrator, John P. Sanderson filed a bill against Robert Harrison, Sen., and H. Starrett, Trustee, under the deed of 1844, for the

possession of the slaves therein conveyed. The bill having been taken for confessed for want of answer, it was afterwards decreed that said Robert Harrison, Sen., had no right, title or interest in or to the estate of said Mary E. Sanderson, deceased, and the possession of the said slaves, was directed to be delivered to the said John P. Sanderson.

The bill in this case was filed after the decree aforesaid, and it alleges that none of the parties complainant herein, were made parties to the bill filed by Sanderson, as aforesaid ; that they had no day in Court, although seriously prejudiced by said decree, and are consequently not bound by the same. Mary M. E. Harrison, claims that under the deed of marriage settlement of 1813, she has an interest separate and distinct from her husband, in the property decreed to Sanderson under the deed of trust of 1844, of which she could not be divested by the act of her husband, and asserts that the existence of the deed of 1844, was not known to her until after the removal of the negroes therein attempted to be conveyed, from the plantation in Nassau County, where Robert Harrison Sen., and his family resided.

The bill further charges that of the negroes attempted to be conveyed by the deed of trust of 1844, two were of those conveyed by the marriage settlement of 1813 ; six were derived to her as an heir at law of her father, and included in the trust of 1813, as part of the estate to which she is therein declared to be " well and sufficiently entitled to," and nine were purchased or are descended from these purchased, subsequently to the deed of 1813, with the proceeds and income of the property therein conveyed.

Robert Harrison, Junior, and others, children of the said Robert Harrison, Senior, and Mary M. E. Harrison, also complainants to the bill, allege that they are entitled to an interest in remainder in said property, to take effect after the death of their parents, and charge that if the negroes are yielded up to Sanderson, under the decree rendered in the case against Robert Harrison and Starrett, their rights and interests will be jeoparded, if not wholly lost, and ask the intervention of the Court to protect their rights in the premises.

Elizabeth S. L. Jones, is the executrix of Joseph Jones, the last survivor of the Trustees named in the marriage settlement of 1813, and as such claims to be Trustee under the said marriage settlement.

John P. Sanderson demurred to the bill of complainant, and sets forth the following as causes of demurrer, viz :

"That the complainant's said bill (in case the allegations thereto were true, which this defendant doth in no wise admit,) contains not any manner of equity whereon he can ground any decree or give the complainants any relief or assistance as against him this defendant.

"And for further and other causes of demurrer to the said complainant's bill of complaint, this defendant, John P. Sanderson, saith that it appears by the marriage settlement referred to by complainant's bill, exhibited A, and which is by the said complainants referred to and made a part of said bill of complaint, that the heirs, executors and administrators of the said surviving trustee, Joseph Jones are necessary parties to said bill, inasmuch as it is therein stated that the said Robert Harrison did bargain, sell, convey, assign, transfer and set over the property mentioned

in the marriage settlement, (referred to in said bill as exhibit A) to Samuel Harrison, James Nephew, William Anderson and Joseph Jones, and the survivor of them, and to the heirs, executors and administrators of such survivor, and that the said complainants have not made the said heirs of the said survivor, Joseph Jones, trustee, a party to this bill.

"And for further and other causes of demurrer to the said complainant's bill of complaint, this defendant, John P. Sanderson, saith that it appears by the said bill of complaint, that Elizabeth S. L. Jones became and is trustee in the place and stead of the original trustees named in the marriage · settlement referred to and named in said bill of Mary M. E. Harrison, wife of Robert Harrison, Senior, and it also appears in and by said bill that the said Elizabeth S. L. Jones, trustee of Mary M. E. Harrison, is joined as a complainant with Chas. P. Cooper as next friend of the said Mary M. E. Harrison, and that the said Mary M. E. Harrison sues not only by the said trustee but by her next friend the said Chas. P. Cooper.

"And for further and other causes of demurrer this defendant, John P. Sanderson, saith that it appears by the said bill the same is exhibited by the said complainants against this defendant and one Robert Harrison, Senior, as defendants thereto, for several distinct matters and causes, in many whereof, as appears by the said bill, this defendant is in no way interested:

And for further and other causes of demurrer to the said bill of complaint, this defendant saith that it appears by the said bill that the same is exhibited against this defen-

fendant by the said Mary M. E. Harrison, by her trustee and next friend and by Robert Harrison, Junior, in his own right and as next friend of Evelyn A. Harrison and Marion S. Harrison, as complainants thereto, for several distinct matters and causes, in many whereof, as appears by the said bill, this defendant is in no way interested, and by reason of such distinct matters the said bill is drawn out to a considerable length, and this defendant is compelled to take a copy of the whole thereof, and by joining distinct matters together which do not depend on each other, the proceedings in the progress of the said suit will be intricate and prolix, and thus this defendant put to unnecessary charges and expenses in matters which in no way relate to or concern him.

"Wherefore and for divers and other causes of demurrer this defendant demands the judgment of this honorable Court."

The demurrer being overruled, Sanderson appealed.

*G. W. Call, Jr.*, for appellant.

*Philip Fraser* and *C. P. Cooper* for appellees.

BALTZELL C. J., delivered the opinion of the Court:

This case depends upon the power of a husband, under a marriage settlement, to convey an interest in certain slaves, part of the property settled. Robert Harrison, Sr., previous to his intermarriage with his present wife, then Miss Mary M. Cooper, in connection with his intended wife, conveyed to trustees a large number of slaves, his own property, and also other property of hers " in trust to the use and behoof of himself and his wife for and during their natural lives, and after the determination of that estate, in trust for the use, benefit and behoof of the child or

children of them, the said Harrison and wife, share and share alike to them, their heirs and assigns forever." This was dated 9th June, 1813.

After the intermarriage of his daughter Mary with John Sanderson, he conveyed on the 4th of January, 1844, eleven negroes to a trustee for the only proper use, benefit and behoof of his said daughter.

Mrs. Sanderson having died, her husband filed his bill asserting title to the property under the conveyance aforesaid, and by virtue of his marital rights, against Robert Harrison, Sr., and the trustee of his wife, and after hearing and argument of counsel, a decree was rendered by the Circuit Court of Duval county "that Robert Harrison, Sr., is not heir or distributee of the said Mary Sanderson, and has no right, title or interest in and to the estate of the said Mary Sanderson in remainder, reversion or otherwise and that the complainant Sanderson is entitled to the possession of said slaves," and an order was passed for their delivery to him by said Harrison.

The present bill is filed by Mrs. Harrison, wife of Robert Harrison, through the executor of the surviving trustee, and by her other children, claiming that the conveyance to Mrs. Sanderson was invalid and carried no interest to her nor to her husband, Sanderson.

This, of course, involves an inquiry into the marriage settlement between Harrison and his wife, and the nature and extent of the interest of the parties to it. It has been assumed that a separate estate is created by it for Mrs. Harrison, which we think by no means clear. The property is not settled to her sole or separate use ; the words are, "*to the use, benefit and behoof of himself and wife.*"

Undoubtedly, such words, applied to the wife, will not create a separate estate.    Can the addition of the husband and the connection of his name make a difference?

The books are not silent as to this subject.   In an elaborate opinion delivered by C. J. Saffold, of Alabama, the Supreme Court of that State say, "the property (slaves) is declared to be for the joint use and support of husband and wife and subject to their joint possession.   Was any case cited in argument where, by construction, so much violence was done to the language of the deed as to maintain that a clause expressly creating an estate for the *joint use* and support of *two* was intended to create a separate property for *the sole use of one?*"   Clancy, (p. 269) after a very learned investigation of the whole subject and a review of the cases, says: " All these cases clearly prove that there must be a manifest intention evinced by the language of the donor that the wife shall have the *exclusive* property in the gift, without which Courts of Equity will not suffer the legal rights of the husband to be superseded."   They then say, "they come to the conclusion that this gift cannot enure to the separate use of the wife and child or either, and that the marital rights of the husband have not been excluded."   Haskins vs. Coalter, 2 Porter, 473 ; see also Wardell vs. Chastain, 17 Con. Eng. Ch., 225; Ibid., 9 Simon 525.

A reference is given in a note to Hill's work on Trusts, p. 420, n. by Wh. to Bender vs. Reynolds, 12 Ala., 441 and Geyer vs. Br. Bank, 21 Ala., 414, but we have not been able to procure them.    4 Ired. Eq. 241.

It may be proper to remark that more stringent expressions would seem to be required by the later authorities to

create a separate estate, than once were considered suffi-cient. Hill on Trusts by Wh., 611.

Even if the wife have a separate estate the inquiry arises, as to the interest of the husband, Robert Harrison in the property conveyed, and the broad ground has been assumed that he had none that he could convey. It is very clear that he has an interest if she has one, and if he has none she is in the same condition. The authorities as to the relative rights of the two parties will be found to be as follows : " Where property belonging to the husband and of which he is the purchaser, by settlement is vested in trustees in trust, to pay the income to the husband and wife jointly during their joint lives, the husband alone will be entitled to receive the whole income." Hill on Trusts, 427; Duncan vs. Campbell, 12 Simons 616.

" A husband in equity as well as at law is entitled to the receipt of the income of his wife's property as a compensa-tion for his liability to maintian her." Hill on trusts 410 n. 3 Simons 370; 1 Roper Hus. and Wife, 273.

"Consequently he will be entitled to the uncontrolled beneficial enjoyment of her life interest unless he deserts her." Hill 410.

In Jones vs. Mayrant the Court of Appeals of South Carolina, say " it was decided in Barrett vs. Barrett, that the husband supporting the expenses of the household was entitled to the whole of the profits of the trust estate settled jointly on the husband and his wife. Under such a settlement the creditors of the wife would not be allowed to deprive the wife of her maintainance." 4 Dess. 602. In the case of Napier vs. Wightman the same Court say "this settlement provides that the defendant Wm. J.

and his wife shall have the whole of this estate (slaves &c.) during their joint lives *without assigning* any part to her separate use, and if it be true, and that will not be controverted that all the chattle interests of the wife, belong to the husband, he is entitled to the whole income of this estate so long as they both live, and if arrested on a *Ca- Sa.* from a Court of law would be required to assign." 1 Spears Eq. 369.

The terms of the deed were to trustees in trust for the joint use of husband and wife, during their joint lives, then to the use of survivor during life &c. The same Court says farther in the same case: "I shall not stop here to enquire whether under the Statutes of uses the defendant Wightman has not a vested interest in the whole of the real estate during life. It is very clear that under the provision in the settlement, *he is entitled to the income of the whole estate real and personal, for the joint lives of himself and wife, and during his life if he survives,* with power of disposition as to one half absolutely. Ibid. p. 370.

Whilst then we have seen that Harrison had and interest in the trust estate, the question yet arises as to his power to convey, which also has been earnestly and seriously denied and questioned. In the case of Shomo vs. Bobe decided at the present term, we had occasion to express our views on the subject of alienation in general, and we desire to refer to them in connection with this case.

On this subject before referring to authorities more directly in point, it may be well to refer to the general law as well as to the reasons for its existence. " A conveyance to B. in trust or for the use of C., or where only the equitable title passes as in case of a conveyance to B. to the use

of C. in trust for D.   The trust in this last case is executed in D. though  he has  not  the  legal  estate."   4 Kent 305.

Our own Legislature in the law passed to secure the rights of married women gives the right of disposal to the man and wife.   We will  add that in  speaking of the  power of alienation, Blackstone says:  "we must consider rather the incapacity than capacity of the several parties,  for all  persons in possession are *prima facie* capable of conveying and purchasing, unless the law has laid them under peculiar disabilities," &c. and among these he enumerates persons attainted of treason, idiots, &c. &c.   2. Black. Com. 290.

Whilst such is the general rule, we shall find no diversity as to the particular subject of inquiry.   "A perpetuity will no more be  tolerated when it  is covered with a trust, than when it displays itself undisguised in a settlement of the legal estate."   1 Lewis on Trust, 138.

"It is absolutely against the constant course of Chancery to decree a perpetuity, or give any relief in that case. 1 Chan. Reports, 144 ; 5 Jac. Law Dic., 143.

Blackstone in his Commentaries, speaking of the changes made by Courts of Equity in the doctrine of uses, says: "They have raised a new system of national jurisprudence, by which trusts are made to answer in general, all the beneficial ends of uses, without their inconvenience and frauds. ' The trust will descend, may be alienable, is liable to debts, to executions on judgments, &c."   2 Black. Coms., 337.

"The *prima facie* rule of trusts, is that the intention of the settler shall be carried into effect, but the intention cannot

be pursued when it contravenes the public policy of the law." "So trusts cannot be created with a proviso that the interest of the *cestui que trust* shall not be aliened, or shall not be subject to the claims of creditors. If it can only be ascertained that the *cestui que trust*, was intended to take a vested interest, the mode in which, or the time when the *cestui que trust* was to reap the benefit, is pefectly immetarial, the entire interest may either be disposed of by the *act of the cestui que trust*, or may become vestedin his assignees by operation of law." Lewis on Trusts, 137–8; 6 Simon, 524; 1 R. and W., 395; 1 Simon, 66; 18 Vesey, 429.

In one of these cases, the Lord Chancellor says, "there is no doubt, generally speaking, that if property is given to a man for his life, the donor cannot take away the incident to a life estate. Equity making a *feme* the owner of it, and enabling her as a married woman to alien, might limit her power over it, but the case of *a disposition to a man*, who if he has the property has the power of aliening, *is quite different*." 6 Simon, 434.

"A trust is assignable. An equitable interest may be assigned, though it be a mere possibility, and either with or without the intervention of the trustee, and the assignee of the *cestui que trust* may call upon the trustee to convey to him, and on his refusal may file a bill to compel a conveyance without making the assignor a party," Lewin on Trusts, 499; Philips vs. Bridges, 3 Vesey, 127; Goodear vs. Ellison, 3 Russ. 583.

In Lady Arundel vs. Phipps, which was a settlement to the use of Lord and Lady Arundel for their lives and the life of the survivor, Lady Arundel became equitable owner

of goods and chattels, and she became so under a contract of purchase which she insisted she was entitled to make with her husband himself, and her purchase was sustained against the creditors of the husband. 10 Vesey, 140–7–8.

In Ford, trustee, vs. Caldwell, the deed conveyed to the joint use of husband and wife for life, not subject to their debts, and after the death of either, to the use of the survivor for life, and after the death of the survivor to the use of the children of the marriage. Speaking of this state of facts, the Supreme Court of South Carolina, Judge O'Neill pronouncing the opinion of the Court, says : " I hold, the trust was executed in the husband, at least for his life. For, according to the deed, he was entitled to the possession of the slaves; having this, he had both the legal and equitable estate for his life. For the trustee had nothing to do with it during this time, he had delivered the slave to one who was under no legal disabilities ; this was equivalent to a conveyance to him for the time he was to possess it. For the condition annexed to the trust, not to be subject to the debts or contracts of the husband and wife, is void. The husband having both the legal and equitable estate *could transfer it, which he did,* to Chur." The general property was in Ford, trustee, but he had parted with the right to possess it to the *cestui que trusts,* Swift and wife, for life. At law, the wife's being and rights are merged in the husband, and hence his possession for the joint use of himself and wife for life, made the property for that time his entire qualified legal estate." This was a suit at law instituted by trustee against the purchaser. 3 Hill, 249.

In Love vs. Hodges, which was to a trustee for husband and wife, the same Court quote the same case as

follows : "In personal estate the legal estate remains in the trustee until he executes the trust by delivering the possession to one capable of holding in himself a legal es-estate in the property to the extent of the interest intended to be conferred by the deed. In this case the trustee had nothing to do with the property during the life of the husband. He had delivered the slave *to* one who was under no legal disability. This was equivalent to a conveyance to him for the time he was to possess it." 1 Spears, 596.

An idea prevails that though the income and profits may be assigned, yet the body, the *corpus* of the estate, may not be. If this be the case, we have not perceived it in the general rule stated nor in the particular cases cited.

There is another aspect of the case worthy of consideration. Suppose a decree made in favor of Mrs. Harrison, as contended for, and the property restored, who would take the possession, who be entitled to the income during the life of Harrison? The answer is not a difficult one, the husband, Harrison himself, and no other person, so that the suit may be regarded, and properly cannot be regarded in any other light, than as one instituted by him and for his benefit against his own assignee.

Were these authorities less clear and satisfactory than they seem to us to be, we yet think the decree in favor of Sanderson against Harrison conclusive as far as his possession of the property, his interest in it and his power of alienation are concerned. It was the decision of a Court of competent jurisdiction as to these issues on the subject itself, and whether erroneous or not it constitutes the law of the case. We shall not undertake to say that this decision is conclusive on Mrs. Harrison in every possible

aspect of the case. It is sufficient that the facts presented by the record do not remove such conclusion. As far as the facts of this case are concerned, we have possession by the husband of the trust property for near forty years to the present time—thirty years prior to the transfer to Mrs. Sanderson, with receipt by him of the income, profits, &c., without interference by the trustees, alienation by the father and husband so possessed to his daughter, possession by the latter and the right of her husband confirmed and established by decree of the Court.

As far as the law is concerned, we find Robert Harrison, the husband, rightly entitled to the possession of the property, to the income and profits arising from it,—that he had a right to sell to the extent of his interest, and his assignee to hold it.

We have not referred to the fact that the assignment to Mrs. Sanderson does not conflict with the main design of the deed of trust, but is merely in advance of it. The children of the marriage are expressly provided for in the settlement. Nor is the case altered by the fact, that by the dispensation of Providence the husband, rather than the wife, is before us claiming the benefit of the last settlement. He has been decided to be entitled to her rights and interests, and is entitled to the same favorable consideration that she would be if contending for the property herself.

It remains to dispose of the case as far as the children of Mrs. Harrison are concerned, who claim the remaining interest after the termination of the life estate. The question of their interest can only be before us for one purpose, and that is for the protection of the property, so

that they may assert their interest when it comes into existence. This they may be entitled to obtain from the Court, on a proper showing by a bill *quia timet*. If the property is in danger of being diverted and squandered, and they have the interest contended for as against Sanderson, they may obtain relief from the Court. *1 Story Eq.*, §827. Osborne vs. VanHorn, 2 Fla. 361.

We have not considered whether, if Robert Harrison, by any casualty should become unable to support his wife, she might not have a right to call upon Sanderson to contribute to the extent of his interest. Such case has not been presented by the proof nor the pleadings, nor have we thought proper to determine the question of her right in the event of his death and her surviving. These questions will be appropriately decided when properly presented.

The decree of the Circuit Court overruling the demurrer will be reversed and set aside, and the case remanded with directions to dismiss the bill of complaint and dissolve the injunction without prejudice to other rights and interests than those now determined.

DuPONT, J. Delivered the following

### DISSENTING OPINION.

The demurrer in this case raised numerous interesting questions, both with respect to the form and substance of the bill, all of which were very elaborately and ably argued by the counsel engaged on either side. In the opinion delivered by the Chief Justice as the opinion of the Court, there is no reference to the points made by Counsel in regard to the form of the bill, but the views of the Court are confined exclusively to the substance. In em-

bodying my *dissent*, which reaches as well to the Judgment pronounced, as to the reasoning upon which that judgment is founded, I shall restrict myself entirely to the positions assumed in the opinion, and pass by the points made by Counsel, without reference thereto any further than may be necessary to elucidate or give consistency to my views. I have endeavored to analyse the opinion and to extract from it the distinct propositions, upon which the argument seems to be based; and these several propositions, I shall now proceed to notice in the order in which they occur.

First. It is assumed in the opinion, that the words of the deed of settlement, executed in anticipation of her inter-marriage with the defendant Robert Harrison, did not create a separate estate for Mrs. Harrison, and the following words quoted from the deed of settlement are referred to in support of that position viz: "*to the use, benefit and behoof of himself and wife.*"

I readily admit that such words do not *ordinarily*, according to the authorities, create a separate estate for the wife, they not implying by themselves, an intention to exclude the marital rights of the husband. The doctrine on this subject depends, for the most part, upon implication and construction. The rule is, that where by the terms of the deed, or settlement, the *intention to exclude the marital rights of the husband,* is already expressed, or can be reasonably implied, in such case a *trust* for the wife will be declared. No particular form of words is essential; the intention to exclude the marital rights of the husband is all that is required to be shown. Clancy on Hus. and Wife 262, 2 Bright's Hus. and Wife 211, 2 Story's Eq. Ju. § 1381.

Now supposing that there were no *other* words in this deed defining the objects of the settlement, and the intention of the grantor, than those quoted by the Court, is no implication to be deduced from the fact that the *husband himself* was the settler or grantor? What object other than the *exclusion of his marital rights* could have induced him to execute the deed? If the property, notwithstanding the solemn execution of this marriage settlement, was still to be subject to the marital or common law rights of the husband, then the deed was wholly nugatory ; nay, it became a solemn mockery, a ridiculous farce, a heartless *fraud*, perpetrated at the very base of the Hymenial altar, and in the immediate presence of the great I AM !!

The case of Tyrrel vs. Hope (2 Atk. R. 558) is directly in point and fully sustains me in this view. Lord Hardwicke held that a promise in writing from the intended husband to the intended wife, that "she should receive and enjoy the issues and profits of one moiety of the estate then in the possession of her mother, after the decease of her mother," gave to the wife an estate to her separate use. Such assuredly would not have been the effect and operation of those words, had the settlement been made by a third party; but being made by the intended husband, his Lordship said that the stipulation could bear no other construction, although the words "separate use" were not to he found in it, for as he very justly remarked, to what end should she receive the rents and profits, if they became the property of the husband the next moment? Upon the same principle it is, that gifts and presents from the husband to the wife, though made after marriage, will be supported in equity against himself and his representatives;

and such gifts will be considered as the wife's *separate property*. (*Vide* Atherly on Marriage Settlements 231, citing Lucas vs. Lucas 1 Atk. R. 270.)   Now it is clear that all gift's or present's to the wife of personal property, made by a third party or stranger, where there is no *express* stipulation that it shall be to her separate use, becomes immediately the property of the husband, *jure mariti*.   But the gift being made *by the husband*, the conclusion of law is, that it was his *intention* that it should enure to her separate use.   *Vide* Steel vs. Steel 1 Ind. Eq. R, 452, cited in Hill on Trustees 420, (margin) where it is held "that a conveyance by a *husband* in trust for his wife, will also be necessarily for her *separate use;* otherwise, the disposition would be futile."

But there *are* other words to be found in this deed (not noticed or referred to in the opinion of the Court,) which conclusively settles the interpretation to be given to the deed of settlement.   It is expressly provided that "the property conveyed is not to be liable to the payment of any debt, judgment, execution, account demand *or otherwise,*" of the husband, and this stipulation is coupled with a proviso "that the husband and wife, with the approbation and assent of the trustees, may at any time, by writing or writings under their respective hands, and attested by two or more credible witnesses, revoke, and make void, alter and change, all and every of, or any of the trusts or estates hereinbefore limited &c."   Now if these two stipulations, do not each of them clearly indicate the *intention* to exclude the-marital or common law rights of the husband, (and that is all that is required, in order to create a sepa-

rate estate for the wife) then I confess that I am unable to appreciate the import of language.

The position of the Court, however, seems to be based upon this view, that because the settlement is to the *joint* use of husband and wife, therefore no *separate* estate could be created in the property. In the language of the authority cited from 2 Porter, " the wife must have the *exclusive* property in the gift, without which Courts of Equity will not suffer the legal rights of the husband to be superseded." If by the phrase " *exclusive* property," it is intended to assert that the wife may not enjoy a " *separate* estate " *jointly* with the husband, then it is very manifest that the error of the position originates in the confounding of the two terms " separate estate" and " estate in severalty." These several terms have each a precise technical meaning, and the existence of the latter is by no means dependant upon the former. By the term "separate estate " I understand to be meant, such an estate as may be enjoyed by the wife, exempted from the marital or common law rights of the husband, and that such enjoyment by the wife may be either in *severalty* or *joint-tenancy*. Indeed, the books of reports are full of such cases. The authority of 2 Porter, cited to this point in the opinion delivered by the Court, I have examined and find it to be a case in which the deed, under which the wife claimed, conveyed a strictly *legal* title, and consequently it can have no bearing on the case under consideration. A " separate estate " is exclusively the creature of equity, and when the deed conveys the *legal* title to the wife, *eo instanti*, the property, if it be personalty, becomes according to the rules of the common law, the property of the husband. In the case cited, the

property was conveyed directly to the wife by her father but to be held "to the only proper use and behoof of the husband and wife during their joint lives, and to remain in their joint use and possession, for the use and support of the said Rachel and James, (husband and wife) and none others." It is very clear that the terms of the deed created a purely *legal* estate in the husband and wife, there being no words from which an intention to exclude the common law rights, of the husband could be inferred.

The question raised in the case cited from 9 Simons was simply, whether the words of the deed created a separate estate for the wife, and is as dissimilar in the facts as it is inapplicable to the law of this case.

I have been equally unfortunate with the Court, in not having been able to procure access to the two cases cited to the same point from 12 and 21 Alabama R. and also 4 Ired. ; but I will venture the assertion, that although in those cases the property may have been settled to the *joint use* of the husband and wife, yet upon examination it will be found that there were no words in the deed expressly excluding the marital or common law rights of the husband, or from which such intention could be reasonably implied.

I am forced then to the conclusion, with all proper deference to the opinions of my respected associates, that the deed of settlement executed by the defendant, Harrison, in contemplation of his marriage with the complainant, Mary E. Harrison, did create in her a *separate estate*, to be enjoyed by her *jointly* with her husband, free from the operation of his marital or common law rights.

The position is assumed by the Court, secondly, that the

58

settlement being to the *joint use* of the husband and wife, he (Harrison) was entitled to receive the issues and profits of the property, and *consequently* had the right to dispose of the *corpus* of the estate. The language of the Court on this point is as follows: "even if the wife have a separate estate, the enquiry arises as to the interest of the husband Robert Harrison in the property conveyed ; and the broad ground has been taken that he had none that he could convey. It is very clear that he has an interest if she has one, and if he has none she is in the same condition." The Court then proceed to cite authorities to show that where the property has been settled to the *joint use* of husband and wife, he is entitled to receive the income of the same.

It is a misapprehension on the part of the Court to suppose that there has been any denial of the position, that Harrison has an *assignable interest* in the property. It is admitted that he has, but the question is as to the *quality and extent* of that interest. Without intending to admit the applicability of the authorities cited to this point, I readily accord to the husband the right to receive the *issues and profits* of an estate settled as this is ; and I moreover yield to him the right to dispose of *them* (i. e. the issues and profits) provided such disposition do not defeat or impair the object and design of the settlement ; but I do contest his right to alienate the *corpus* of the estate. His interest in the property is only a *joint use*, and he may not assign a larger estate than he has under the deed of settlement ; the entire *corpus* of the estate must remain intact. (vide Blake vs. Irwin, 5 Geo. R. 345; Cadogan vs. Kennett, Cowper's R. 432). In this latter case the Court remark: " If Lord Montford had let his house with the furniture, or if

the rent could be apportioned, the creditors would be enti-
tled to the *rent*, but they have no right to take the goods
themselves; the possession of them belongs to the trus-
tees."

I have not had access to the cases cited in the opinion
from 3 and 12 Simons, but have examined those cited from
4 Dess., and 1 Speer, and I find that they both fully sustain
the view that I have taken of this question.

The case of James vs. Marant, 4 Dess. R., 591, was upon
a bill filed by a creditor, to subject the "*profits and pro-
ceeds*" of trust property, settled to the separate use of the
wife, to the payment of a debt incurred for the benefit of
the estate.   There was no attempt to reach the corpus of
the estate, the prayer of the bill asking only to subject the
"*profits and proceeds,*" and the decree of the Court was ac-
cording to the prayer, "that the trustee do account with
the complainant, before the commissioner for the annual
income of the trust estate, until the debt be paid."   In the
quotation from the opinion delivered in that case, and cited
by this Court, it is said " under such a settlement the cred-
itors of the husband, would not be allowed to deprive the
wife of her maintainance," and if not, I may ask upon
what ground will it be permitted to a party, with full
*notice* and without a *valuable consideration*, to take to him-
self the corpus of the estate, out of which that maintain-
ance is to accrue ?

The case of Napier vs. Wightman, (1 Speer Eq. R., 357,)
also cited in the opinion of the majority, is a very strong
authority in support of my views on this point.   In that
case, it was determined that the deed *was not a marriage*
*settlement*, and further, that there was no *separate estate*

created by it, but that the trust was for the *joint use* of the husband and wife, *and not exempted from his marital rights* ; and yet, notwithstanding the existence of the legal rights of the husband to control and appropriate the *proceeds* of the estate, inasmuch as the deed created a *trust,* the Court very properly refused to go further than to subject the *income* of the *estate,* for the joint lives of the husband and wife, and one half of the personalty, *saving the life estate of the wife,* to the payment of the husband's debts. No stronger case than this need be cited to support my position.

A third and the main position assumed in this opinion is, that the trust becoming *executed* in the husband, by the delivery of the *possession,* he thereby acquired the legal estate, and consequently the right to convey it.

There is doubtless much refined learning upon this very subtle subject of executory and executed trusts, and with the principles of the decided cases for our only guide, it not unfrequently becomes somewhat difficult to determine when a trust has been executed, or is only executory. But however true this may be in respect to ordinary trusts, I will venture the assertion, that in regard to trusts arising under marriage settlements, where a *separate estate* is created for the benefit of the wife, (whether that estate is to be enjoyed by her in *severalty,* or as a *joint usee* with her husband,) the doctrine that the delivery of the possession operates as an execution of the trust does not obtain.

As applicable to the facts of this case, it may be further observed, that the refinements and complications attending conveyances, or devises to uses, are confined to assurances of real estates, and are seldom encountered where the subject of the settlement is of personalty. (Vide Watson vs.

Pitts, cited in 1 Speer's Eq. R., 587.) It seems also that the intention of the settler, as it may be gathered from the terms of the instrument, ought to prevail. If the object and design of the settlement will be defeated by the application of the doctrine, it will not be permitted. Hill on Trustees, 233.

In the case of Harton vs. Harton, 7 T. R., 652, which was a settlement in trust for a *feme covert*, to permit her to receive the rents for her separate use, Lord Kenyon held that in order to effectuate the testator's *intention*, the legal estate must be declared to reside in the trustees ; otherwise, if the trusts were held to have been *executed* in her, the husband would be entitled to receive the profits, and so defeat the object of the devisor.

As specially applicable to the point now under review, I refer to the case of Blake vs. Irwin, 3 Georgia R., 345, the facts of which are made to coincide with those of this case, in a most remarkable degree. That case, like this, arose out of a marriage settlement—the property was vested in trustees, to be held in trust for the use of *the husband* during his life. He was to have the entire possession, and to exercise reasonable ownership over the property, and to alter and change the same, by and with the consent of the trustees, provided it was for the benefit of the trust estate. If the wife survived the husband, then she was to have the entire use during her natural life, with the power of disposing of one half thereof by will, and in the event, of offspring between them, the whole estate to vest in the child or children, the trustees to have a right at any time with the consent of both husband and wife, to re-settle the

property.   It will be perceived that this is not as strong a case in one material particular, as the case before us.

In the case under consideration, the property was settled in the first place (immediately after the consummation of the marriage) to the *joint use* of Harrison and wife for life; in the case cited, it was so settled to the *separate* use of the husband.   The *corpus* of the estate was levied upon under common law process, for the husband's debts, and after the most searching and elaborate argument of able counsel on both sides, it was held that "the legal title remained in the trustees, and that the equitable interest of the husband in the property was not liable to be seized and sold by the Sheriff, under an execution at law, but that the proper remedy for the creditors was in a Court of Equity."   The position assumed by my respected associates was critically examined by both the Counsel and Court, and indeed was the only one upon which the plaintiff in execution relied. Judge Lumpkin, in a very able opinion delivered in the case, has set forth the true doctrine in so clear a light, that I need do no more than quote his language.   "In behalf of the creditors," says he, "it is insisted that even if the statute of uses and the 10th section of the statute of frauds, did not apply to personalty, that still the very deed itself conveys the possession to the use, and transfers the use into possession, thereby making Blake the complete owner of the property, as well in law as in equity.   It is true that the entire use is given to him, but it is the *use* only and not the *corpus*.   It is also true that he is entitled to the possession, but that possession is evidently not an inherent right by virtue of the estate which he held, but bestowed upon him as the agent rather of the trustees."   Again, he re-

marks, "It is difficult to lay down a distinct rule showing when a trust is and when it is not executed. The cases of Cardwardine vs. Cardwardine, 1 Eden R. 33, and Leicester vs. Leicester, 2 Taunt. R. 109, would prove that it is not sufficient to prevent the estate from being executed, that the, trustee, has something to do ; but it would seem that whenever the object of the trusts would be defeated by its being executed, as in cases of trusts for married women, or to preserve contingent remainders, or where the trustee has some discretion to be exercised in relation to the estate, or where there is some object to be effected by the estate remaining in the trustee, that in all such cases the instrument will be construed not to convey an executed trust. And he cites to this point Posey vs. Cooke. 1 Hill R. 414, Laurens vs. Jenny et al. 1 Speers L. R. 366. McIntyre vs. Agricultural Bank et al; 1 Hills, Ch. R. 111.

His Honor goes on further to remark, "marriage settlements have the sanction of immemorial usage and of the most enlightened part of the human race ; and this Court would be recreant to its duty, to permit the rules of law to be strained to defeat the end to which this contract was intended. It is true that the use of this property is given to the husband for life, but then he cannot alien without the consent of the trustees, and for the advantage of the trust estate. While this is the case he cannot deprive the wife of a maintenance, even if he derived it out of this property. Her interests, therefore, are essentially protected by this deed, independently of the power reserved of resettling the estate. To allow it then to be sold at law, to pay the husband's debts, would be to defeat the very end for which the trust was created."

With how much greater force will this reasoning apply (as in the case before us) to a party who claims against the trust, not as a creditor, nor as a *bona fide* purchaser without notice, but as a mere *volunteer* with full notice of the trust, and without having given any *value* for the title.

This doctrine of executed trusts was again brought under review in the same Court, in the case of Wynn vs. Lee, 5 Geo. R. 217, and the case of Blake vs. Irwin was referred to and approved. Nisbet J. in delivering the opinion of the Court remarks: "The defendant in the Court below insisted that Mrs. McMillan, the *cestui que trust*, having possession of this slave from her trustee, Lee, the deed of trust was executed, and that he as trustee, could not maintain trover for him. The Circuit Judge disaffirmed this doctrine, and so do we. The legal estate was in the trustee; of that, he had never been divested. The trust was not alone for Mrs. McMillan; it was also for her children. It was not a trust consummated when the slave was delivered in her possession. She would not, by a sale, defeat the limitation over to the children. The trustee held the legal title for the purposes of the trust, and was entitled to the possession as against strangers to the deed, at law, as against Mrs. McMillan herself. We think the Court was right in sustaining the action." (Citing Lewin on Trusts, 247 and 481; Willis on Trustees, 72, 73, 77, 84, 109, 482; Blake vs. Irwin, 3 Geo. R. 345; Hill on Trustees, 274; Goodtitle vs. Jones, 7 T. R. 47., 4 Barn & Ald. 745, and Jones vs. Jones, 3 Bro. C. C. 80.)

But I need invoke no stronger authority to sustain my position, than the cases from South Carolina, cited to this point in the opinion of the majority. The views expressed by Judge

O'Neall in deciding the case of Ford vs. Caldwell, do seem to favor the doctrine contended for by this Court; but it will be seen by reference to his Honor's opinion delivered in the cases of Rice vs. Burnett and Joor vs. Hodges, afterwards dicided in the Court of Appeals of South Carolina, (1 Speer's Eq. R. 602) that he took occasion to modify and limit those views very much, if indeed he did not recant them altogether.   With respect to these two cases he remarks:  "In these cases I concur in the judgment of the Court, by which the motion is dismissed in the first case, and the decree is reversed in the second, but I came to my decision for reasons different from those mentioned by my brother (Chancellor Dunkin) in the jugdment just read.   I still adhere to the doctrine, that a trust in personalty, is a mere bailment, and that it is executed, *exactly according to the purposes intended by the donor*, and to the extent pointed out in the deed, by the delivery of the possession to the *cestui que trust*."

After proceeding to enforce this position in an elaborate argument and by the citation of numerous authorities, he closes by remarking in reference to the cases which had been just decided.   "So much for the principle which I suppose these cases are to overturn. In the cases themselves according to the principles which I have maintained, there is no difficulty.   In both *the trust is partially for a married woman,* incapable of acting *sui juris,* something still remains to be done by the trustee, showing that the possession is not absolutely in the husband.   Both are antenuptial settlements.   In the first case, the property may be sold by the trustee and the *cestui que trusts,* and the proceeds invested in other property.   This shows that the

possession was to be permissive only, a mere tenancy at will, if we can properly use such terms about personality. In the other case, at the death of each, he is to assign, transfer and set over the property to the next one entitled. This also qualifies the possession. But it is said that this conflicts with Ford vs. Caldwell, it does not so seem to me. There the settlement was post-nuptual, the posses-sion was never changed, it was in the husband all along; there was nothing to be done by the trustee, for the life of the husband. His possesion was absolute for his life and when he sold the slaves, I do not see how the trustee could recover them from his alienee. So far as he and the trustee were concerned, the trust was executed and that was all that case decided."

It is very evident from the tenor of these remarks that his honor did not intend to be understood as sanction-ing the doctrine, to the extent to which it has been carried by the majority of the Court, in this case, if indeed, he did not expressly *repudiate* such an application of it. But however, that may be, it is quite certain that this doctrine, as thought to be announced in Ford vs. Caldwell, was expressly overruled, in the two cases of Rice vs. Bur-nett (1 Speers Eq. R. 579) and Joor vs. Hodges (Ib. 593.)

Chancellor Dunkin in a very elaborate and well consid-ered opinion, delivered in the former case, reviewed the whole doctrine of executed trusts, and expressly repudiated the principles assumed in the case, of Ford vs. Caldwell, as the ground of the judgment rendered therein. He re-marks: "So in Ford Trustee. vs. Caldwell, the deed was a gross fraud upon creditors and void by the common law,

but a majority of this Court is of opinion that *it cannot be safely rested upon the principles therein assumed.* For myself I think it best that the rules of the common law, and the practice of the country, as I suppose it to have existed until 1832 should prevail. Deeds of this character should be construed according to their plain intent and meaning. The legal estate should continue in the person to whom it is transferred, until the property is to be delivered to those for whom an absolute estate is provided. If those who are entitled to the intermediate use for life or years, should attempt to remove or destroy the property, there exists no good reason why he, to whom the legal estate was transferred, and probably in reference to these very contingencies, should not have the authority promptly, to interfere to assert his legal rights and prevent the destruction of the trust property. If on the other hand, those entitled to the equitable use for life, or any other equitable interest are indebted, their creditors should resort to the appropriate forum. If creditors were compelled to come into equity, for the purpose of making the husbands' interest liable, there are various equities by which their claims might be rebutted."

It will thus be seen that the principle, as thought to be announced in Ford vs. Caldwell, which is chiefly relied on, by this Court, as the ground of their judgment in this case, if not repudiated by Judge O'Neall (and I think it is) has been emphatically rejected by the subsequent decisions, of the same Court. And I may add that all of the foregoing remarks, of the learned Chancellor, with respect to *creditors,* will apply with ten-fold force to a mere *volunteer pur-*

*chaser*, as is the claimant in the present case, *according to the admissions of the demurrer.*

I have also the authority of Chancellor Harper to support my position. It is true that when the case of Joor vs. Hodges came before him at *chambers*, he decided it in accordance with the doctrine contended for by this Court, but in doing so he showed his disapprobation of the doctrine in a most marked and emphatic manner, and took occasion to declare that he made the decission under the pressure of the *decided cases*, and it was at his instance that the point was carried before the appellate tribunal for review. After commenting upon the several cases which had been previously decided by the Court of Appeals of South Carolina, (Ford vs. Caldwell amongst the rest) in which it was supposed that the doctrine had been sanctioned, he very significantly remarks: "If indeed when property is conveyed in trust, for the joint use of husband and wife for life, the use is to be executed in the husband, so as to render it liable at law to his creditors." I do not perceive what purpose is answered, by having a trustee to a marriage settlement." He then closes his opinion with the following observations: "But still if the execution of the trust depends on the right of possession, and the actual possession, I must, according to the cases decided, declare it to be so executed in this instance, so as to render it liable to creditors at law. It is said in Pyron vs. Mood, that in Equity, if the purchasers had notice of the trusts, the rights of the wife might possibly be protected. But if the property be liable at law, I know of no ground on which equity could interfere. I am bound to follow the law. *I am not well satisfied with my conclusion,* and wish

that it may be revised by an appellate tribunal. 1 Speer's Eq. R. 597–8.

I have been unable to discover the relevancy of the several citations from Kent, Blackstone, Lewin on Trusts, and others, in reference to "conditional estates" and "perpetuities," and therefore do not appreciate their force as applied to the facts of this case. If it were intended by these citations to intimate that the estate created by the deed of settlement in this case, contains any one element of either a "conditional estate" or a "perpetuity," I can only observe that, in my opinion, it is clearly a misapprehension of the purport, design and legal effect of the deed.

The next position assumed in the opinion of the Court is, that this suit is to be regarded as instituted by Harrison (the husband) for his own benefit. By what process the Court have arrived at this conclusion, I am unable to perceive. Harrison is a defendant in the bill and not a complainant. No *answer* has been filed that I am aware of, but the case comes before us simply upon general *demurrer*, and we are therefore bound to take the facts to be as they are stated in the bill. Besides, if it be permitted to the Court to advert to *presumptions*, it seems to me that the *legal* presumption would be, *that it was his interest to protect his own conveyance.*"

In order that I may not misrepresent the views of the Court as set forth upon another distinct branch of the case, I will quote the language of the opinion in reference to that point: "The decree," say the Court, "in favor of Sanderson against Harrison, is *conclusive* as far as his possession of the property, his interest in it, and his power of alienation are concerned. It was the decision of a Court of compe-

tent jurisdiction as to the issues on the subject itself, and whether erroneous or not it constitutes the law of the case. We shall not undertake to say that this decision is conclusive on Mrs. Harrison *in every possible aspect of the case.* It is sufficient that the facts presented by the record do not remove such conclusion."

It must be recollected that neither Mrs. Harrison or any other of the complainants in this case, were *parties* to the suit, in which that decree was rendered ; and it certainly will not be required of me to invoke the aid of authority to show that no person can ever be concluded by a decree, unless he were a party thereto, or a privy in estate. Such evidently is not the position of Mrs. Harrison or any of these complainants, and I am therefore utterly at a loss to perceive the principles of law or equity upon which the position of the Court is based.

But the limitation or *qualification* contained in the proposition, is of itself fatal to the principle assumed. If the decree be conclusive against Mrs. Harrison as a complainant in this suit, *so as to deprive her of the corpus of her estate;* to what *greater* extent, I would respectfully inquire, can it ever be made to affect her interest in this property? The qualification then, to my mind, is wholly nugatory for any practical purpose—it is " making the promise to the ear and breaking it to the hope."

Another position taken in the opinion of the majority is, that the conveyance of the property by Harrison to his daughter, Mrs. Sanderson, did not conflict with the main design of the marriage settlement, inasmuch as the children of the marriage were expressly provided for by the deed; and that such assignment was merely an anticipa-

tion of that design.   The argument is more specious than sound—it will not bear the test of examination.   The very act of *anticipation* is in direct conflict with the primary and controlling design of the settlement, viz : the preservation of a *life estate* to the wife and mother, in all the property embraced in the deed of settlement.   This act of anticipation, if operative, effectually *destroyed* her life estate *pro tanto,* and was a manifest infraction of the proviso contained in the deed, which stipulates that any *alteration* of the trust should be made only by the *joint* act of the husband and wife, and with the assent of the trustees. But again, what evidence is there in the record tending to show the proportion which this property bears to the whole estate; and consequently how the other remaindermen will be affected by the abstraction of this portion of the property, when the time limited for a final division of the estate shall have arrived.

There are two questions in regard to Mrs. Harrison's, possible interest in the property in controversy, which the Court, in the opinion delivered, expressly reserve as open questions, and desire to be understood as not concluded by their decision, viz ; First, " whether, if Robert Harrison by any casualty, should become unable to support his wife, she might not have a right to call upon Sanderson to contribute to the extent of his interest."   And secondly, "her right (in the property) in the event of his (Harrison's) death, and she surviving him ?"

The very expression of a *doubt* upon either of these points is an entire surrender of the whole argument in regard to the position assumed in the opinion, viz : that the trust in this property had become *executed* in Harrison by the de-

livery of the possession to him. The argument on that
point, as I understood it, was this: that the trust contained
in the deed of settlement for the joint use of Harrison and
wife, became *executed* in Harrison *by the act of possession*
—that the trust becoming executed, invested him with the
*legal* title to the property; this being added to the equitable
title which he before possessed, gave him the entire inter-
est in the property, with all the incidents of *absolute* own-
ership; and being thus invested with an absolute estate, he
had a perfect right to alienate the property, as he did.
This was the argument as I understood it, and it is the
only argument upon which the position assumed by the
Court, with respect to the trust having been executed in
Harrison, can be sustained.  If I have misapprehended the
views of the Court upon this subject of *executed trusts*, then
the whole argument falls to the ground and the position
with it.

Now if it be true that Harrison thus acquired an *absolute*
title to the property, with the consequent *right of aliena-
tion*, what question can arise as to the extent of Sander-
son's interest in the property conveyed?  If Harrison
acquired an absolute estate by the execution of the trust,
Sanderson also acquired an *absolute* estate by the execu-
tion of the conveyance to Starratt.  The *doubts* expressed
by the Court would lead legitimately to the inference, that
they view Sanderson as standing in the relation of a *trustee*
to this property, and as holding it coupled with the trusts
of the original marriage settlement.  Such a view of the
matter, I again repeat, is a virtual surrender of the position
assumed by the Court, based upon the doctrine of " execu-
ted trusts."  But be that as it may, the doubts themselves

are eminently *suggestive.* It may transpire in the order of Providence, that Robert Harrison may, "by some casualty, become unable to support his wife," and in the order of a like Providence it may occur that Sanderson, before the happening of such event, may have gone "to the bourne whence no traveller returns," and his estate been *distribu-ted* so as to be beyond the beneficent arm of the Chancel- lor. What, under such circumstances, would be the situation of Mrs. Harrison? What her remedy? The answer embodied in the intimation of the Court is, that she may *pursue* the property in whomsoever's hands it might be found. But it may be beyond the reach of pursuit, and the effort wholly unavailing. Thus it will be seen that she whose comfortable support and maintenance was the special and primary design of a solemn deed of marriage settlement, made too at the interesting moment when, in the confidence of unsophisticated maidenhood, she was about to assume the responsible relation of wife, is to be referred, for the *security* of her covenanted rights, to the "casualties" of human life, and that too not by consulting the plain *meaning* of the written instrument and the evi- dent *intention* of the settlers, but by the rigid application of a doctrine of the law, which I hazard nothing in say- ing, has not the remotest application to the facts and cir- cumstances of the case.

I now pass to that portion of the opinion which treats of the rights and interests of the *remainder men.* It is ad- mitted by the Court that if they have the interest in the property, for which they contend, they are entitled to file a bill *quia timet,* for its protection. The bill, nevertheless, was dismissed without considering their interests. Whether

or not this was the correct practice, or whether the bill should have been retained *on their behalf*, and to the extent of that interest, is left somewhat in doubt by the authorities. It is doubtless the general rule, that where it appears on the face of the bill, that some of the plaintiffs have no interest in the suit, if the misjoinder be taken advantage of by *demurrer*, it will have the effect to dismiss the bill; but there are cases in which it is held that where the misjoinder consists not in the want of interest in some of the complainants, but only in their having been made plaintiffs instead of defendants, in such case the bill will be retained, and a decree made to the extent of the interest involved.

If however, the dismissal of the bill, so far as the remaindermen are concerned, proceeded upon the assumption, that there was not sufficient in it to constitute it a bill *quia timet*, or upon the objection taken at the argument of the case, viz: that it was a *compound* bill of review, and *quia timet*, I am of opinion that either position is unmaintainable.

Without intending to indulge in a critical disquisition upon the necessary qualities of a bill *quia timet*, I apprehend that it will be found upon examination, that this bill contains all the allegations, charges and prayers, essential to constitute it a bill of that character. The objection that it is a compound bill, will not hold good. In the case of Whiting vs. the Bank of the United States, (13 Peters S. C. R., 6,) the Supreme Court of the United States say: "The present bill seeks to revive the suit, by introducing the heirs of Whiting before the Court, and so far it has the character of a bill of Revisor. It seeks also to

state a new fact, viz : the death of Whiting before the sale, and so far it is supplementary.   It is therefore a *compound* bill of Review, of Supplement and of Revivor, and it is entirely maintainable as such, if it presents facts, which go to the merits of the original decree of foreclosure and sale."

Having thus disposed of the several positions contained in the opinion delivered on the part of the majority, · I will now proceed very briefly to state my views in regard to the merits of the case.

By reference to the deed of settlement, it will be seen, that it conveyed property, consisting principally of slaves, to trustees ; the legal estate to be held by them upon divers trusts : first, for the use, benefit and behoof of the husband, until the solemnization of the intended marriage and after consummation of that event, to the use and behoof of the husband and wife, during the period of their natural lives, ("without any manner of waste, or impeachment of waste,") and with remainder over to the issue of the marriage.

Secondly. In case there should be no issue of the marriage, then the estate to go absolutely to the survivor. There is also in the deed, a special stipulation, " that the property conveyed, is not to be liable for the payment of any debt, judgment, execution, account, demand or otherwise of the husband," and that stipulation is coupled with a proviso, that the husband and wife, "with the approbation and assent of the trustees, may at any time, by writing or writings, under their respective hands, and attested by two or more credible witnesses, revoke and make void, alter

and change all and every of, or any of the trusts, or estates, hereinbefore limited.

It is also· proper to remark, that there are three distinct classes of property mentioned in the bill, to which the complainants set up title.

1st. The particular slaves named or referred 1o in the deed of settlement.

2nd.· The *natural issue and increase* of those particular slaves.; and

3d. Such slaves as are therein alleged to have been *purchased* by the husband, out of the *profits and proceeds of the trust estate*, together with the natural issue and increase of the same.

With respect to the first class, it will be readily perceived from the general views which I have hereinbefore expressed in regard to the main position assumed by the Court, as the ground of their judgment, that I do not recognize any right in Harrison, the husband, to alienate any portion of the *corpus* of the estate. In arriving at this conclusion, however, I am not at all influenced by that argument of the counsel for the complainants, wherein he invoked the *analogy* of the law, relating to the *real* estate held in joint tenancy by husband and wife. In such case, the estate is even more than an ordinary joint-tenancy— it is an estate held by *entirteies*; and the husband may not alienate even a moiety, or any portion thereof, without the concurrence of the wife. 2 Black. Com., 182.

There may exist a joint tenancy in things *personal*, and when so held, the estate is subject to all the rules governing *real* property. (2 Black. Com., 399.) But this must be taken to be so, only as between *strangers*, for a joint

tenancy in the *legal* estate, cannot exist between the husband and wife, and for this very simple reason, based upon a canon of the common law, that the husband *jure mariti* is entitled to all the personal estate of the wife, to which she has the *legal* title, and which may have come to his possession in his life time; and if he is entitled to that which comes to her in her *individual* right, *a fortiori* he is entitled to that which is conveyed to them *jointly*. It is laid down in Roll's Abridgment, 343, that "when the husband is *jointly* possessed of a leasehold interest, or other *personal* thing, he may dispose of it in his life time, without the consent or concurrence of his wife."

And again, at page 349, that "if goods are given to the husband and .wife, the wife shall not have them by survivorship, but the executor of the husband." Vide 3 Bac. Abr., ( Bird Wilson's Ed.,) 647.

It will thus be perceived, that no argument can be based upon any *analogy* supposed to exist between the t wo kinds of property. I desire to place the rights of the wife upon safer and higher grounds, viz: that of an *express trust*.— Under the provisions of the settlement, the husband was entitled only to the *joint use*, with his wife, in the property conveyed, and that too to be enjoyed only during the term of his natural life. The legal estate was not in either of them,—it resided in the trustee.

With respect to the second class of property specified in the bill, viz : *the natural issue and increase* of the females slaves, I can perceive no sound principle of law, upon which they can be made to take a direction different from that given to the first class. If we resort to adjudications upon this subject, it will be found that in the Southern States of

the confederacy, where negro slavery is a cherished domestic institution, there exists an unbroken current of decisions, which has settled the principle that *partus sequiter ventrem.* It is the doctrine of humanity.

But I have a surer guide to my conclusion, in the intention of the parties who executed that settlement. The object and design evidently was, while careful to secure to the wife a comfortable maintainance for herself and family during the term of her natural life, to make a competent and *substantial* provision for the issue of the marriage. If I am corret in this interpretation of the intention of the parties to the deed, then it is very evident that the object contemplated, could be secured only by causing the issue of the female slaves to follow the condition of the mothers.

If, as was insisted in argument, the trusts are to be restricted exclusively to the slaves mentioned in the deed, it is very evident that in view of the casualties of human life, and the certain and irresistable encroachments of age, the provision for maintenance and support would stand upon a very narrow and unstable basis, and the expectations of the issue of the marriage as remainder-men, would be doomed to certain disappointment.

But we need not resort to implication, in order to ascertain the intention of the parties—the deed itself speaks a language which is not to be misunderstood. In the conveyance to the trustees, it expressly and in terms conveys "the issue and increase of the females." I presume that this particular language of the deed escaped the observation of the very vigilent and astute Counsel who argued the case for the appellant, or he would not have sought, as

he did, to distinguish between the two classes of property.

With respect to the *third* class, viz: that portion of the slaves including their natural increase, which is represented in the bill, as having been *purchased* by Harrison, with the "profits and proceeds" of the trust estate, I have felt greater difficulty in arriving at a satisfactory conclusion. It is undoubtedly correct as a general principle, that where trust money or the *proceeds* of a trust estate, is invested in the purchase of property, or in any other manner, the particular investment, or the property so purchased, will be deemed in equity to enure to the benefit of the original trust. This however is but the enunciation of a *general principle,* and like all general principles, when it does not contravene the policy of the law, must yield to the clearly ascertained intention of the parties, whether that intention be manifested by the express stipulations of the deed, or can be reasonably *implied* from the object and design of the settlement. To my mind, whether we resort to the one course or the other as an index to the intention of the parties, it is very apparent that it was never the disign of the settlement, to restrict or limit the power and control of the husband, with "respect to the proceeds and profits" of the trust property, any further than might be necessary to effect the *primary* object of the trust, viz: to secure to the wife a comfortable and adequate support and maintenance for herself and family, during the term of her natural life. So long as the *corpus* of the estate was kept intact, I think that the husband had a right to appropriate and dispose of the surplus of the proceeds and profits, as he might deem best, and according to his own will and

pleasure.   And I am strengthened in  this conclusion, from
the fact that there is no provision in  the deed looking to
any *accumulation* of the estate, other  than that  intimated
in  the stipulation, with respect to the " issue and increase
of the female slaves."

There is moreover to be found in the deed  of  settlement
a very peculiar and unusual  clause, which  would seem to
favor the view  which  I have  taken of  this branch of the
case.   I allude to the  clause  which  expressly  stipulates
that the *joint use* of the [estate  is to be enjoyed by the hus-
band and wife, during the term of their naturel lives, *"with-
out any manner  of waste or impeachment of waste, to be had,
done, made or committed."*   This stipulation, in the  connec-
tion in which it is found,  is manifestly inapplicable,  and if
subjected to a  rigid  construction,  would  become  wholly
nugatory.   But being inserted in the deed, it was evidently
intended to convey some meaning, and it  is our duty,  look-
ing to the intention of the  parties, to  give it such an inter-
pretation as  may render it  most  consistent with  the con-
text.

"Waste and impeachment of waste" are technical terms,
and are found only in  conveyances of *real estate,*—they are
entirely inapplicable to *personalty.*  " Waste  or *vastum.*"  "*It*
(says Blackstone) is a  spoil  or destruction of houses, gar-
dens, trees or other corporeal heriditaments, to  the disheri-
son of him that  has the remainder  or reversion in  fee-sim-
ple or fee-tail."   (2 Black. Com. 281.)

Impeachment of waste signifies a restraint from commit-
ting waste upon  lands or tenements, or a  demand  or com-
pensation for  waste  done  by  a  tenant, who  has  but a
particular  estate  in  the lands  granted, and  therefore  no

right to commit waste. All tenants for life or any less es-
tate are liable to be impeached for waste, *unless they hold
without impeachment of waste ;* in the latter case they may
commit waste without being questioned, or any demand
for compensation for the waste done." 2 Coke, 82. 1 Bouv.
L. D. 484.

Proceeding to give an interpretation to this clause of the
deed, so as to save it from being rendered wholly nugatory,
and to make it consistent with the context, I am clearly
of opinion that it is susceptible of but one meaning, viz:
that the tenants of the particular estate should be permit-
ted to enjoy the *joint use* of the same, "*without account*,"
either as between themselves or as between them and the
remainder-men. If I am correct in this construction, then
it results as a necessary consequence, that Harrison, the
husband and one of the tenants of the particular estate,
had the right to appropriate to himself such portion of the
"proceeds and profits" of the trust property as might re-
main after providing out of it an adequate support for the
wife and family. If he appropriated this surplus to the
purchase of property for himself, as I think he might well
have done, then he had an unquestionable right to alienate
it, and the conveyance to Starratt, in trust for his daugh-
ter, the late Mrs. Sanderson, ought to be sustained *to that
extent* as good and valid.

If the *demurrer* had been restricted to this portion of the
bill, I should have concurred with the majority of the Court
in sustaining it; but being general to the entire bill, I am
constrained from the views which I entertain in regard to
the whole case, to *dissent* from the judgment of the Court
upon the well recognized principle of equity practice, that

61

"a demurrer bad in part is bad in whole, and must be overruled."

I should have been gratified to have had the opportunity to give my views in regard to the very many interesting questions, so ably argued by counsel on either side, but the length of this opinion admonishes me of the propriety of now bringing it to a close.

If I have exceeded the limits usually assigned to a dissenting opinion, I claim an apology in the paramount importance of the questions involved, and in the firm conviction (with all deference for the views of my respected associates) that the doctrines announced in the opinion of the Court are not only unsustained by authority, but are in direct conflict with the best interests of society, and take away the only shield which an affectionate and provident parent is allowed to interpose for the protection of his confiding and often unfortunate daughter, and her innocent and helpless progeny.